OPINION *Page 2 
{¶ 1} Although originally placed on our accelerated calendar, we have elected, pursuant to Local Rule 12(5), to issue a full opinion in lieu of a judgment entry.
 {¶ 2} Defendant-Appellant, Markelus Q. Carter, appeals the judgment of the Allen County Court of Common Pleas granting a civil protection order on behalf of Plaintiff-Appellee, Sonya R. Burkholder. On appeal, Carter asserts that the trial court abused its discretion in issuing the civil protection order because Burkholder did not present sufficient supporting evidence. Finding that the trial court did not abuse its discretion, we affirm the judgment of the trial court.
 {¶ 3} In December 2007, Burkholder filed a petition for a domestic violence civil protection order ("CPO") against Carter, the father of her children, after he allegedly threatened her with a gun, punched her, and pushed her. Burkholder requested protection for herself and her two minor children with Carter, Markelus, Jr. (DOB 10/30/92) and Tarah (DOB 7/23/1994) (jointly referred to as "the children"). Thereafter, the Allen County Court of Common Pleas granted the ex parte CPO.
 {¶ 4} In January 2008, the trial court amended the ex parte CPO to allow Carter visitation with the children. Additionally, the trial court held a full hearing on the CPO at which the following testimony was heard. *Page 3 
 {¶ 5} Burkholder testified that, late on December 17, 2007, she was watching a movie in a bedroom that she shares with Tarah while Tarah slept; that Carter came into the bedroom with a gun, turned off the light, and told her to "get out of his house" (hearing tr., p. 6); that he pointed the gun at her and she began to pack her bags while Tarah continued to sleep; that Tarah awoke at some point; that she proceeded down the stairs and Carter held something to her back, which she believed was the gun; that she went into the "lobby" of the home to retrieve her keys when Carter struck the side of her head with the gun; that the blow caused her to fall and, when she stood up, he pushed her up against a wall; that she fell again and he struck her with his foot or fist while she was on the ground; that she did not see the children at any time while this was happening, but heard Tarah say "where is mommy? What is wrong with mommy" (hearing tr., p. 8); that she believes Tarah said this from the stairway area, where she would not have been able to see Burkholder; and, that she then left the home at approximately 1:30 or 2:00 a.m. and flagged down a police officer to tell him what had occurred.
 {¶ 6} Burkholder continued that she contacted her friend and co-worker, Krista Boedeker, after the incident; that her face was swollen and bruised for approximately one week after the incident; that two people, including Boedeker, observed her injuries at her workplace later that week; that Carter has struck her in the past; and, that she is afraid of him. *Page 4 
 {¶ 7} On cross-examination, Burkholder testified that she did not see a doctor for her injuries after the incident; that she met with an attorney, law enforcement, and a prosecutor within several days after the incident, but that none of these individuals photographed her injuries; that she informed law enforcement that Carter had a black handgun, but that she did not know what kind of gun it was; that she was aware Carter owned a BB gun, but did not know what it looked like; that she told law enforcement that Carter was holding the children hostage in the home; and, that she does not know if Carter actually threatened the children.
 {¶ 8} Officer Shawn Neidemire of the Lima Police Department testified that he is a hostage negotiator; that, early on December 18, 2007, he was called to a domestic violence situation where the suspect was allegedly inside a residence with two children; that law enforcement repeatedly knocked on the door and called the residence but received no response; that, eventually, law enforcement called a S.W.A.T. team to the scene; that, while speaking with Burkholder about the incident, Carter called her cell phone; that he began speaking with Carter on Burkholder's cell phone at 4:15 a.m., and spoke with him for several hours, asking him several hundred times to come out of the residence; that Carter refused to come outside and the standoff persisted until 8:11 a.m.; that, after the standoff ended, an inventory of the residence recovered a pellet handgun, which can be *Page 5 
dangerous if used on the face, but will not break the skin on most people; and, that this type of gun looks identical to a semi-automatic handgun.
 {¶ 9} On cross-examination, Officer Neidemire testified that he characterized the incident as a hostage situation because there was a domestic violence report and the suspect refused to respond to law enforcement, but that he is unaware whether the alleged victim said anything about there being a hostage situation; that, when he spoke with Carter on the telephone, he explained that police officers were at the residence; that, at some point during the conversation, Carter expressed a desire to speak to legal counsel; that law enforcement officers attempted to contact Carter's attorneys, but were unsuccessful; and, that he did not take any photographs of Burkholder or observe any injuries, but that this was not his assignment.
 {¶ 10} Krista Boedeker, Burkholder's friend and co-worker, testified that, on December 17, 2007, shortly after 2:00 a.m., she received a phone call from Burkholder requesting help; that she located Burkholder who was very afraid and whose jaw area was dark red, puffed out, and swollen; and, that she noticed the discoloration of Burkholder's face for approximately three or four days at work.
 {¶ 11} On cross-examination, Boedeker testified that she did not notice the discoloration at work, but at her home, because Burkholder and the children were *Page 6 
staying with her for a period of time following the incident and Burkholder did not return to work until several days later.
 {¶ 12} Carter testified that he has a felony conviction for possession of a controlled substance; that he asked Burkholder to leave the residence because he suspected she was being unfaithful to him and wanted to alleviate stress that causes him to have seizures; that he never threatened Burkholder with a gun or even had a gun in his hand; that Tarah was awake the entire time and went downstairs with him and Burkholder; that Burkholder was aware that he owned a BB gun; that his cell phone was on vibrate and he noticed it was vibrating at approximately 2:00 a.m.; that an officer got on the phone and asked him where the children were; that he told the officer that the children were sleeping and that he was going back to sleep because he had to get the children to school in the morning; that the officer continued to ask him what was going on and told him that law enforcement officers were outside of the home that wanted to speak with him; that he looked out the window during the conversation and saw the S.W.A.T. team outside; that, at that point, he requested his attorneys be contacted; that he noticed the S.W.A.T. team's weapons and was afraid for himself and his children; and, that he eventually walked out of the house because the children's school was cancelled due to snow and because there were witnesses outside. *Page 7 
 {¶ 13} Tarah testified that she is thirteen years old; that she awoke the night of the incident when Carter and Burkholder were arguing; that she recalls Carter telling Burkholder that she had until midnight to get out of his house; that Carter left the room, then returned and turned off the light and left; that she couldn't see him when he was in the hallway because she was still in bed; that Burkholder turned the lights back on and began packing her bag; that she walked downstairs with both Carter and Burkholder; that Burkholder departed around 12:30 a.m.; that she never observed a gun; that, later that morning, Carter woke her and informed her that Burkholder told the police that he put a gun to her (Burkholder's) head; and, that she looked outside and saw law enforcement officers.
 {¶ 14} Shortly thereafter, the magistrate issued a decision proposing issuance of a CPO for a period of two years, specifically stating that "[b]ased upon the weight and sufficiency of the evidence, [Burkholder's] evidence is more credible and a civil protection order shall be issued herein." (Magistrate's Decision, p. 5).
 {¶ 15} In February 2008, Carter filed objections to the magistrate's January 2008 decision, arguing that the magistrate made errant findings of fact and improperly applied the law to the facts of the case.
 {¶ 16} In March 2008, the trial court issued an order adopting the magistrate's decision and overruling Carter's objections, stating that: *Page 8 
 This Court is very skeptical of Markelus Carter's recitation of these particular events and his explanation of his reactions to the events.
 After an independent review of the transcript in this case it is this Court's opinion that the Magistrate's Decision shall be affirmed in all respects. This Court believes Markelus Carter did threaten [Burkholder] causing her to fear for her safety and struck [her] as well.
 The testimony presented established, by greater weight of the evidence, that Markelus Carter had committed acts which would constitute that of domestic violence and a civil protection order is appropriate to be issued to protect the person of Sonya Burkholder from further such acts by Markelus Carter.
(March 2008 Judgment Entry, pp. 3-4).
 {¶ 17} It is from this order that Carter appeals, presenting the following assignment of error for our review.
 THE TRIAL COURT ABUSED ITS DISCRETION IN AFFIRMING THE DECISION OF THE MAGISTRATE BECAUSE PETITIONER HAD NOT MET HER BURDEN OF PROOF AS TO THE EVIDENCE NECESSARY TO SUPPORT THE ISSUANCE OF THE REQUESTED CIVIL PROTECTION ORDER, AS THE MANIFEST WEIGHT OF THE EVIDENCE SUPPORTED MR. CARTER'S DEFENSE.
 {¶ 18} In his sole assignment of error, Carter contends that the trial court abused its discretion in adopting the decision of the magistrate and issuing the civil protection order because the petitioner did not meet the appropriate burden of proof to support the issuance. Specifically, Carter contends that Burkholder did not sufficiently prove that he committed an act of domestic violence and that the manifest weight of the evidence does not support a conclusion that Burkholder *Page 9 
sufficiently demonstrated that she was in danger of future violence by Carter. We disagree.
 {¶ 19} A trial court's decision of whether to grant a CPO is within its sound discretion, and an appellate court will not reverse that decision absent an abuse of discretion. Brubaker v. Farr, 3d Dist. No. 13-05-32, 2006-Ohio-2001. To find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary, or unconscionable, and not merely an error of law or judgment. Id., citing Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. Additionally, as the trial court is in the best position to observe the witnesses and to assess the credibility of their testimony, we must presume the accuracy of the trial court's findings. Seasons Coal Co.,Inc. v. City of Cleveland (1984), 10 Ohio St.3d 77, 80.
 {¶ 20} In order to grant a CPO against an individual, a trial court must find that the proponent has demonstrated by a preponderance of the evidence that the individual's family or household members are in danger of domestic violence. Brubaker, 2006-Ohio-2001, ¶ 17, citing Felton v.Felton, 79 Ohio St.3d 34, 41-42, 1997-Ohio-302. R.C. 3113.31 discusses domestic violence and provides that:
 (1) "Domestic violence" means the occurrence of one or more of the following acts against a family or household member;
 (a) Attempting to cause or recklessly causing bodily injury; *Page 10 
 (b) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 or 2911.211 of the Revised Code[.]
 {¶ 21} Here, Burkholder testified that Carter pointed a gun at her, held the gun to her back, struck the side of her head with the gun, pushed her up against a wall causing her to fall, and struck her again while she was on the ground. Additionally, Boedeker, Burkholder's co-worker and friend, testified that her face was swollen and bruised for approximately one week. Finally, Burkholder testified that Carter had struck her on a prior occasion. Although Carter testified that he never struck or threatened Burkholder, and no other witnesses testified that they observed her injuries, based upon all of the evidence, we cannot find that the trial court abused its discretion in granting the CPO — particularly given that the trial court is in the best position to assess witness credibility.
 {¶ 22} While we are concerned that some courts will grant protection orders on evidence that is dubious at best, and that they do so for fear of denigration if some violence would occur after such an order was denied, we cannot say that this trial court's decision in this case was unreasonable, arbitrary, or unconscionable.
 {¶ 23} Accordingly, we overrule Carter's sole assignment of error. *Page 11 
 {¶ 24} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment Affirmed. PRESTON and WILLAMOWSKI, JJ., concur.
 r *Page 1